[No. D058674. Fourth Dist., Div. One. Nov. 29, 2011.]

YAVAPAI-APACHE NATION, Plaintiff and Appellant, v.
IIPAY NATION OF SANTA YSABEL, Defendant and Respondent.

COUNSEL

Browne Woods George, Browne George Ross, Eric M. George and Ira Bibbero for Plaintiff and Appellant.

Rosette & Associates, Rosette, Robert A. Rosette, Meagan J. Reed and Michelle A. Carr for Defendant and Respondent.

OPINION

**HUFFMAN, J.**—Plaintiff and appellant the Yavapai-Apache Nation (YAN) appeals from the trial court's order granting the motion to quash service of summons filed by defendant and respondent Iipay Nation of Santa Ysabel (previously known as the Santa Ysabel Band of Diegueno Indians; Nation). YAN's breach of contract action arose from alleged breaches by Nation of obligations contained in several related documents, including a multimillion dollar loan agreement that has been amended and restated numerous times, and that is accompanied by YAN's written loan guaranty agreement of Nation's performance of the loan agreement, also amended and restated numerous times. YAN's complaint alleges that the documents amending the loan agreement, in particular the fourth amendment, signed by Nation's tribal chairman on its behalf under a legislative authorization by Nation to engage in such a transaction, included valid waivers of tribal sovereign immunity that allowed dispute resolution in the California courts.

In response to the service of this California complaint, Nation brought its motion to quash service of summons on the ground of tribal sovereign immunity. Nation argued that no effective waiver of sovereign immunity was created by the fourth amendment to the loan agreements, because the chairman was given no authority to enter into such an additional waiver on behalf of Nation. According to Nation, all previous dealings among the parties included the enactment by Nation of accompanying legislation creating specific express, limited waivers of immunity for each portion of the transactions. Nation argued to the trial court that the only legislation concerning the fourth amendment, giving authority to the tribal chairman to act on its behalf, was more limited in nature, such that the fourth amendment loan agreement document could not have effectively waived the tribal immunity of Nation.

The record also shows that around the same time that YAN sued Nation for breach of contract and common counts in this action, Nation sued YAN in the Arizona courts, alleging breach of contract, breach of fiduciary duties, and other theories arising out of the accompanying loan guaranty agreement and

its related agreements. Nation further argued in the motion to quash that even if the fourth amendment contained a valid contractual immunity waiver, the waiver did not cover the controversies that were related to the loan guaranty, which were being tried elsewhere, in Arizona. The parties confirm in their briefs on appeal that sovereign immunity issues, like these, are currently being litigated in that Arizona action. Nation's motion was granted.

On appeal, YAN challenges the order quashing service, contending that with regard to the loan agreement disputes and the proper interpretation of the fourth amendment, the trial court failed to recognize that YAN carried its burden to prove, by a preponderance of the evidence, that California jurisdiction exists under the fourth amendment for the disputes about the loan agreement. (*Lawrence v. Barona Valley Ranch Resort & Casino* (2007) 153 Cal.App.4th 1364, 1369 [64 Cal.Rptr.3d 23] (*Lawrence*).) Regarding the loan agreement disputes, YAN argues that Nation's motion to quash merely brought forward evidence to show that its "custom and practice" was to enact legislation to create immunity waivers to accompany its contractual transactions, as was done previously in these transactions, but that no such legislation was expressly required by any authority shown to exist by any admissible evidence (such as Nation's tribal constitution). YAN therefore contends that the contractual waiver signed by the chairman, in the course of his duties in entering into the fourth amendment to the loan agreement, was a fully authorized waiver of immunity.

Although YAN's complaint seeks relief in damages under both the loan agreement and the loan guaranty agreement, YAN now represents on appeal that it does not seek California litigation of issues arising from the loan guaranty agreement, but intends to invoke jurisdiction in YAN's tribal courts for all relief on issues arising from the loan guaranty.

Nation responds to YAN's appeal by citing to examples of legislation it enacted during prior phases of the parties' contractual arrangements, and arguing that the absence of a similar express authorization, related to the waiver in the fourth amendment loan agreement document, undermines any apparent authority of its chairman to waive Nation's sovereign immunity, when he signed the amendment. Nation points out that the fourth amendment text substitutes new language for the previous versions of the loan agreement's article for choice of law and dispute resolution methods and forums, and Nation argues that such a change was unauthorized by the immediately preceding tribal legislative action, and that the loan guaranty tribal court procedures apply to the loan agreement as well.

Based on the parties' course of dealing throughout the loan agreement transactions, in which Nation expressly and irrevocably waived tribal sovereign immunity and allowed court resolution of disputes in those courts having subject matter jurisdiction of any loan agreement problems, we conclude the trial court erred in granting the motion to quash. In any reading of the complaint, together with its exhibits and other submitted documents, Nation cannot properly invoke sovereign immunity to avoid the fourth amendment terms that allow California jurisdiction to be exercised. Nation already irrevocably waived such immunity in the earlier versions of the loan agreement, which the fourth amendment expressly ratified and affirmed, and Nation did not retract its actions. Regardless of any related loan guaranty litigation elsewhere, this record discloses that the amended loan agreement terms permit this action to proceed in California, and we reverse the order that quashed service of summons.

I

*GENERAL INTRODUCTION TO RECORD*

The issues on appeal primarily concern the existence of California jurisdiction over actions based on the loan agreement and its amendments, as opposed to the separate loan guaranty agreement. However, many of the related legislative authorizations relied on by the parties reference both the loan agreement and the guaranty, and thus the issues overlap to some extent. It is important to note that the trial court's ruling made a finding that the tribal legislation that authorized the waivers "consented to suit according to the terms of the tribal dispute resolution process in YAN's Tribal Court." In its opening brief, YAN contends that the trial court appears to have confused the two agreements (loan agreement and the loan guaranty agreement), but YAN agrees that the substance of the ruling was that the fourth amendment to the loan agreement did not contain an enforceable waiver of sovereign immunity and consent to jurisdiction in California state court.

To analyze the waiver issues properly before us, it is necessary for us to describe the two agreements separately, and to set forth the legislative authorization for them separately, even though Nation's legislative resolutions cover both agreements. It is interesting to note that in this case, Nation's legislative acts preceded the execution of each of the agreements that it authorized. This is not a case in which an executed document, with set terms, was later approved or confirmed by later legislation, but rather, a case of prospective legislative authorization of transactions to be carried out as directed by Nation. (See *Smith v. Hopland Band of Pomo Indians* (2002) 95 Cal.App.4th 1, 5–9 [115 Cal.Rptr.2d 455] (*Smith*).)

Accordingly, we will take note of the respective dates of the enactment of the legislative resolutions, and the subsequent amendment of the loan documents, in analyzing the scope of Nation's legislative and contractual authorization for waivers of immunity. The parties dispute the adequacy of the proof presented, and the burden of proof on the motion, concerning the existence of Nation's "customs and traditions" for waiving immunity, as repeatedly referred to in the legislation. Specifically, evidence about the tribal constitution was excluded, and the parties have not cited to any tribal rules or regulation as to the amount of time that may elapse between a tribal legislative resolution, allowing a waiver of sovereign immunity, and the execution of the contractual agreements agreeing to waiver of immunity. Nation is contending that only a few weeks normally elapsed between the legislative authorization of a waiver of immunity, and the later execution of contractual agreements implementing such a limited waiver. On the other hand, YAN argues that it made no difference that a few months elapsed between the October 2008 legislative authorization for the fourth amendment to the loan documents, and the execution of the fourth amendment in January 2009.

Before analyzing the documents in detail to delineate the scope of any allowable waivers of sovereign immunity in the loan agreement and its amendments, and the interpretation of the tribal legislation that authorized any such waivers, we next describe this series of related transactions.

II

*BACKGROUND: LEGISLATION AND TRANSACTIONS*

A. YAN and Nation Enter into Loan Agreements and First
Through Third Amendments

In YAN's complaint, it alleges that it is the successor in interest to one of the parties to a loan agreement entered into in April 2005, in which Nation borrowed money from nonparties JPMorgan Chase Bank and another bank (the Banks), to finance casino construction by Nation (the loan agreement). Exhibits to the pleading show that this loan agreement was amended and restated numerous times, and is secured by credit documents including promissory notes (sometimes collectively the credit documents). In December 2005, the first amendment was made. Subsequently, the parties entered into the second and third amendments to the loan agreement.

At the same times of those loan transactions, YAN and Nation entered into separate loan guaranty agreements, to guarantee the performance of Nation on the loan agreement and to loan it money (see pt. IID., *post*). Different types of dispute resolution provisions are set forth for each, giving rise to this dispute.

In its original version and in its first, second and third amendments (dated from 2005–2007), the loan agreement includes as a dispute resolution provision its article XV, setting forth provisions for an Arizona choice of law, and waiver of jury trial in favor of court trial. As the borrower, Nation waived its sovereign immunity from any suit or proceeding in any forum, including any confirmation of arbitration awards with respect to the agreement and the transactions. Nation consented to the jurisdiction of the courts of the state of Arizona, United States courts, "and the courts of any other state that may have jurisdiction over the subject matter, over any such action, and over Borrower." In the event that the lenders (Banks) require arbitration, or if the Arizona courts or the United States courts decline to hear the action, an arbitration clause set forth can then be invoked, and judgment may be entered on any arbitration award "in any court of competent jurisdiction," including Nation's courts.

### B. Related Legislation Is Enacted for Loan Agreements and First Through Third Amendments

Before the loan agreement, the loan guaranty, and their first, second (and third) amendments as to the loan agreement were signed, Nation enacted legislative resolutions to authorize their enactment and amendment. These lengthy legislative resolutions each include separate portions addressing the loan agreement and the loan guaranty, and set forth different dispute resolution provisions for each. (See pt. IID., *post.*) It is now necessary to outline the format and coverage of those legislative resolutions, regarding their several limited waivers of sovereign immunity for the purpose of Nation's consent to suit, when it entered into both the loan agreement and the loan guaranty and their amendments.

For the original restated version (agreements dated Apr. 22, 2005, & Dec. 1, 2005), Nation enacted general council resolutions (General Council Resolutions) Nos. 05-09 and 05-64 (dated Feb. 13, 2005, & Nov. 6, 2005). They referred to the loan agreement for the construction of the casino, and set forth an amended budget for a cost of up to $33.8 million (also stating that YAN agreed to increase its guaranty amount on certain conditions, including an amended and restated loan and guaranty obligation; see pt. IID., *post*). As to the loan agreement, the resolutions set forth the terms of the new budget, and state that Nation agrees to a limited, irrevocable waiver of its sovereign immunity from any action brought by YAN related solely to these transactions. This waiver allows for binding arbitration and judicial enforcement of any arbitration award by any court of competent jurisdiction, including the

courts of the United States, the state of Arizona, and other courts of competent jurisdiction for the enforcement of any binding arbitration award.[1]

For the approval of the first amendment to the loan agreement (dated Dec. 28, 2006), Nation enacted General Council Resolution No. 06-44, also dated December 28, 2006. It confirms that the tribal council had been authorized to execute and deliver the previous casino construction and financing documents, and that the attached first amendment was required to complete the transactions. The resolution states that no waiver of sovereign immunity or consent to binding arbitration or consent to jurisdiction of any judicial forums "may be granted without the approval of the General Council," in accordance with Nation's custom and tradition, and it then approves the first amendment and directs the chairman to execute and deliver it, without any need for further approval by the tribe.[2]

For the second amendment to the loan agreement (dated Mar. 15, 2007), Nation enacted a 28-page document, General Council Resolution No. 07-03, dated February 11, 2007. It contains numerous subheadings, including separate portions for the loan guaranty and the loan agreement. In the portion referring to the loan agreement, it refers to the chairman's execution and delivery of casino contracts, including the second amendment to the loan agreement, architect agreements, construction agreements with Bayley Construction, and states that in the previous documents, Nation's general council confirmed and approved the tribe's limited waiver of sovereign immunity from suit, including jury trial waiver and agreement to binding arbitration and judicial enforcement of any arbitration award by any court of competent jurisdiction. This was a consent to the jurisdiction of the courts of the United States, the state of Arizona, and other courts of competent jurisdiction for the enforcement of any binding arbitration award. Arizona law is chosen.[3]

In the portion of General Council Resolution No. 07-03 called "Additional Grant of Authority As May Be Necessary to Construct a Casino," authorization to the chairman is given to act on behalf of the tribe in all matters requiring the tribe's approval or authorization for the construction and equipping of the casino, "*subject to the provisions of this Resolution.*" (Italics added.)

---

[1] In the portion of the General Council Resolution No. 05-64 that refers to the loan guaranty documents, the tribal dispute resolution method in YAN's tribal court is set forth, with its own waiver of sovereign immunity.

[2] General Council Resolution No. 06-44 is only three pages long and refers generally to the casino documents, without treating the guaranty separately.

[3] In the portion of the General Council Resolution No. 07-03 that refers to the loan guaranty documents, the tribal dispute resolution method is separately described, with its own waiver of sovereign immunity.

For the third amendment to the loan agreement (dated July 15, 2007), Nation enacted a 30-page document, General Council Resolution No. 07-31, dated July 1, 2007. It also contains numerous subheadings, including separate portions for the loan guaranty and the loan agreement. Regarding the loan agreement, it refers to modification of the bank loans and confirms and ratifies Nation's previous "irrevocable" limited waiver of sovereign immunity and consent to jurisdiction in the courts of the United States, Arizona, and other courts of competent jurisdiction for enforcement of any arbitration award. It states there is a need to modify existing financing for the casino construction, revises the budget and directs the chairman to make any changes to the budget required by construction and political delays, after approval and direction from the tribal council, under the customs and traditions of the tribe.[4]

To accomplish the transaction amendment, Nation's General Council Resolution No. 07-31 dated July 1, 2007, also states that as provided in the original loan agreement, it shall not be necessary in litigation or arbitration arising from the loan agreement to defer to or exhaust remedies in tribal courts. The chairman and the tribal council are given an additional grant of authority to take all other actions *consistent with this Resolution* that are necessary to construct and equip the casino, "provided however, the Chairman may not waive the Tribe's sovereign immunity, consent to binding arbitration, and/or consent to the jurisdiction of any judicial forums without the approval of the General Council of the Tribe in accordance with the customs and tradition of the Tribe."

### C. YAN and Nation Enter into Fourth Amendment to the Loan Agreement, Pursuant to Earlier Legislative Authorization

Around 2007, Nation was having disputes with a contractor on its casino project, Bayley Construction. Nation reached a settlement with that contractor and another, Sodexho (sometimes the contractors).

On October 8, 2008, the "First Legislature" of Nation enacted legislative bill No. LB-07-08, stating: "The Legislature hereby authorizes Chairman of the Executive Branch to negotiate and execute amendments to the various casino loan documents in the best interests of the nation." This bill authorized the chairman to negotiate and execute amendments to the casino loan documents, by reason of the legal dispute between Nation and the contractors. In the authorization portion of the bill, Nation's constitution is cited as

---

[4] In the portion of General Council Resolution No. 07-31 that refers to the loan guaranty documents, the tribal dispute resolution method is separately described, with its own waiver of sovereign immunity.

allowing the First Legislature the power to authorize the chairman to negotiate and execute contracts on behalf of Nation.

The fourth amendment to the loan agreement was negotiated and executed by Nation's Chairman Johnny M. Hernandez on January 30, 2009.[5] In its section 3, it replaced article XV, the dispute resolution and sovereign immunity provisions of the previous loan agreement versions. The fourth amendment retains the loan agreement's Arizona choice of law provision and the waiver of jury trial. It then states that if any legal proceedings are filed in California courts, claims may be determined by a general reference proceeding under Code of Civil Procedure sections 638 through 641.2. As the borrower, Nation waived its sovereign immunity from actions in any forum, including arbitration, regarding the loan agreement transactions. Additionally, Nation/borrower consented to the jurisdiction of the Arizona state courts, California state courts, the courts of the United States, and the courts of any other state that may have jurisdiction over the subject matter, the action, and borrower. In the event that the courts decline to hear the action on jurisdictional grounds, arbitration is prescribed, and judgment on any arbitration award may be entered in the courts of Arizona, California, the United States, or any other court, including but not limited to Nation's courts.

Nation, as the borrower, makes representations and warranties in the fourth amendment that the execution and delivery of the agreement and the performance of the credit documents have been duly authorized by all required actions on its behalf. Specifically, Nation represented that it had approved a formal resolution approving this fourth amendment and other related documents, under its tribal constitution, article 5, section 3.[6]

In addition to replacing article XV in the underlying loan agreement, the fourth amendment separately states the same dispute resolution and sovereign immunity terms, apparently for application in any disputes about its own provisions. These again include the Arizona choice of law provision, the waiver of jury trial, and the use of general reference proceedings under Code of Civil Procedure sections 638 through 641.2. As the borrower, Nation again waived its sovereign immunity from actions in any forum, including arbitration, and again consented to the jurisdiction of the Arizona state courts, California state courts, the courts of the United States, and the courts of any

---

[5] The record also contains a different "forbearance and fourth amendment document," but the operative one does not contain the forbearance language in its title. It is unclear whether Chairman Hernandez still holds office.

[6] The only copy of Nation's tribal constitution in the record, dated 2007, was attached as an exhibit to Chairman Hernandez's declaration, and YAN's objections to its lack of authentication were sustained by the trial court in the ruling. Otherwise, tribal constitutions and ordinances can be proper subjects of judicial notice. (*Smith, supra*, 95 Cal.App.4th at p. 7, fn. 8; Evid. Code, §§ 451, 452.)

other state that may have jurisdiction over the subject matter, the action, and borrower, for purposes of allowing judgment on any arbitration award to be entered in the courts of Arizona, California, the United States, or any other court, including but not limited to Nation's courts. The fourth amendment expressly ratified and affirmed the loan agreement and associated credit documents, stating they contained the entire understanding of the parties and were binding upon them.

### D. YAN and Nation Also Enter into an Amended Guaranty Agreement

Separately, but in connection with the loan agreement, Nation borrowed millions of dollars from YAN, by entering into promissory notes in favor of YAN, and significantly, a written loan guaranty agreement with YAN dated February 12, 2005 (the loan guaranty). The operative version of this loan guaranty is a second amended and restated loan and guaranty agreement (referred to as SARLG), with promissory note dated July 5, 2007. In the SARLG and related note, YAN guaranteed the obligations of Nation under the loan agreement, and YAN retained the right to make payments on behalf of Nation (to be treated as additional loans from YAN to Nation). YAN did so.

In section 4.3 of the SARLG, Nation and YAN mutually waived their sovereign immunity, for the limited purpose of resolving actions arising under it. Section 4.4 of the SARLG requires that a two-step tribal dispute resolution process be utilized regarding any dispute that arises from the loan and guaranty agreement, for binding arbitration in YAN's tribal court. In the SARLG, Nation further consented to jurisdiction of United States courts, including courts of Arizona and California, "for the enforcement of awards pursuant to the provisions of Section 4.4."

Referring to the original guaranty, General Council Resolutions Nos. 05-09 and 05-64 (dated Feb. 13, 2005, & Nov. 6, 2005) endorsed its tribal dispute resolution process, in which tribal chairpersons shall attempt to resolve the dispute, and if unsuccessful, YAN arbitration shall take place in YAN tribal courts. Any resulting arbitration award may be enforced by any court of competent jurisdiction.

In Nation's General Council Resolution No. 07-31 dated July 1, 2007, the SARLG is described and approved. The resolution affirmed the SARLG's waiver of sovereign immunity, for a limited purpose as expressed in that agreement. This portion of the resolution's waiver only allows for the tribal dispute resolution process, and for jurisdiction of United States courts, including California, for the limited purpose of enforcing a judgment obtained pursuant to the tribal process.

Around January 30, 2009, YAN purchased from the Banks all their interests in the amended loan agreement and credit documents. According to YAN, Nation has defaulted on all of its obligations.

### E. YAN and Nation Sue Each Other in California and Arizona

On June 17, 2010, YAN filed this California action to recover $36 million-plus as monies due and owing from Nation, basing its claims upon on the loan agreement and also on the SARLG.[7]

On July 13, 2010, in Arizona state court, Nation sued YAN on the loan guaranty agreement, the SARLG, claiming it seeks to enforce the separate tribal dispute resolution process.

In the briefs on appeal, YAN represents that it will soon be pursuing an action in its own tribal court in Arizona to resolve the disputes about the guaranty portion of the transactions, based on its interpretation of the SARLG.

## III

## *TRIAL COURT PROCEEDINGS*

### A. Nation's Motion to Quash Service of Summons; Opposition and Reply

Specially appearing Nation sought an order quashing service of summons in this action, arguing that it was protected from California suit by sovereign immunity, and it had not consented to suit. Nation argued there was no personal jurisdiction over it, due to this lack of consent and consequently ineffective service on its chairman and at its office. Further, Nation contended there was no subject matter jurisdiction, for lack of its consent to the rights of action alleged in the complaint, concerning the loan agreement or the loan guaranty, and Nation had only consented to jurisdiction in the YAN tribal court. Even if the fourth amendment contained a valid immunity waiver, Nation argued that it could not include the controversies that were related to the loan guaranty, which were being tried elsewhere, in Arizona.

---

[7] Both in the trial court and on appeal, Nation argues that service of summons either on its chairman or on the personnel at its office was ineffective to gain personal jurisdiction, again due to sovereign immunity rules. That assertion stands or falls with the immunity determination, and it is unsuccessful here.

In opposition to the motion, YAN argued that Nation had passed a resolution empowering Chairman Hernandez to negotiate and execute amendments to previous casino loan documents in the best interests of the Nation, such that when he executed the fourth amendment, it was with legislative authorization. The fourth amendment included an express waiver of sovereign immunity and a submission to California jurisdiction, in particular, to resolution of disputes through a referee process under Code of Civil Procedure section 638 et seq. (substituting a new art. XV to the loan agreement).

With regard to the loan guaranty, YAN argued that through Nation's actions by suing YAN in Arizona state court for breach of the same guaranty, it demonstrated it had waived sovereign immunity in that respect as well. YAN sought judicial notice of the Arizona complaint filed by Nation, and a transcript of an Arizona hearing, in which the Arizona judge expressed concern about potentially conflicting rulings. Also, YAN argued that the exhibits previously submitted by Nation, attached to its moving papers, had not been properly authenticated.

In reply, Nation submitted the declaration of its Chairman Hernandez, giving the history of the transactions and attaching numerous exhibits. These included specific examples of Nation's legislation, i.e., the resolutions that were enacted several weeks before execution of the various amendments to the loan agreement, to specifically waive sovereign immunity of the tribe with respect to those transactions, in other forums, under the chairman's authority to do so. However, he declared that as to the fourth amendment to the loan agreement, there was no such accompanying tribal resolution or agreement that specifically authorized a waiver of sovereign immunity, pursuant to the standard practice of the parties, previously. He attached a copy of the legislative bill dated October 8, 2008 (LB-07-08), that authorized him as chairman to negotiate and execute amendments to the casino loan documents, referring to a legal dispute over the project with the contractors, and stating that the Banks (lenders) were requiring amendments to the loan agreement before monies would be released to settle that dispute. Chairman Hernandez did not interpret the text of LB-07-08 as specifically authorizing a waiver of sovereign immunity.

In addition, Chairman Hernandez attached to his declaration a copy of Nation's constitution, effective November 20, 2007. He also included his e-mail to YAN's chairman, attempting to invoke the tribal dispute resolution process.

YAN filed numerous objections to the declaration of Chairman Hernandez, and attachments, chiefly on the grounds that the 2007 copy of the tribal constitution supplied was not authenticated by date, nor was there any explanation of whether that was the same version in effect at the time of the various transactions, beginning in 2005. (See fn. 6, *ante.*) Further, the declaration impermissibly contained numerous legal conclusions and statements without adequate foundation.

## B. Ruling; Appeal

After the hearing, the superior court issued its written ruling, referring to state and federal law providing that only clear waivers of sovereign immunity are enforceable. (*C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla.* (2001) 532 U.S. 411, 418 [149 L.Ed.2d 623, 121 S.Ct. 1589] (*C & L Enterprises*); *Oklahoma Tax Comm'n v. Potawatomi Tribe* (1991) 498 U.S. 505, 509 [112 L.Ed.2d 1112, 111 S.Ct. 905].) The ruling acknowledged that tribal officials cannot effectively waive a tribe's sovereign immunity without gaining authorization from the tribe's governing body. (*Hydrothermal Energy Corp. v. Fort Bidwell Indian Community Council* (1985) 170 Cal.App.3d 489, 496 [216 Cal.Rptr. 59] (*Hydrothermal*) [holding that a tribal chairwoman's signature on a contract could not operate to waive the tribe's immunity from suit unless the tribe expressly delegated the chairwoman that power].)

In the ruling, the trial court framed the issue presented as follows: "The question with the purported waiver in the Fourth Amendment is whether Chairman Hernandez had authority for such a waiver. A Tribal Chairperson cannot unilaterally waive a tribe's sovereign immunity without the tribal government's explicit authority to do so. [Citation.] The signature on a contract that purportedly waives a tribe's sovereign immunity has no legal binding effect unless and until the tribe authorizes it." The court also analyzed other authorities, *World Touch Gaming v. Massena Management, LLC* (N.D.N.Y. 2000) 117 F.Supp.2d 271 (*World Touch Gaming*), and *Danka Funding Co. v. Sky City Casino* (1999) 329 N.J.Super. 357 [747 A.2d 837] (*Danka Funding*), to consider whether an effective waiver was created in the fourth amendment and by legislative action.

In the ruling, the trial court correctly stated that YAN, as plaintiff, bears the burden of proving by a preponderance of the evidence that jurisdiction of the court in fact exists. (*Lawrence, supra,* 153 Cal.App.4th 1364, 1369.) Regarding YAN's objections to the declaration of Chairman Hernandez, the court agreed that Nation's tribal constitution had not been properly placed before the court, with any adequate foundation for the document. Other objections were sustained to portions of the declaration that gave the chairman's own legal opinions, that he did not have the authority to enter into a waiver of immunity on behalf of Nation when he signed the fourth amendment.

The trial court's ruling stated that the tribal legislation that authorized the waivers had "consented to suit according to the terms of the tribal dispute resolution process in YAN's tribal court."[8] Thus, on the merits, even without the tribal constitution in evidence, the trial court determined that YAN had not carried its burden of proving by a preponderance of the evidence that jurisdiction in California courts exists, because "YAN has not shown that the Chairman had the authority to waive immunity by pointing to any legislation of the tribe that authorizes the waiver," specifically, as to the waiver in question in the fourth amendment The court granted Nation's motion to quash service of summons, and YAN filed a notice of appeal.

In preparation for oral argument, this court requested and considered supplemental letter briefing from counsel, advising the court of the status of the related cases referred to in the briefs, in the Arizona courts and in the YAN tribal courts, dealing with the same basic set of documents and disputes.

IV

*STANDARD OF REVIEW AND ISSUES PRESENTED*

A. De Novo Review; Burden on Motion to Quash

The issues in this case are complicated by the fact that both litigants are Indian tribes, strongly supporting the sovereign immunity concept, but taking opposing positions on this particular immunity issue. No one disputes that in opposing Nation's motion to quash that asserted tribal sovereign immunity from suit, YAN bore the burden to prove, by a preponderance of the evidence, that California jurisdiction exists. (*Lawrence, supra,* 153 Cal.App.4th 1364, 1369.) Absent conflicting extrinsic evidence, we apply a de novo standard of review to the trial court's ruling quashing service of summons. (*Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1180 [127 Cal.Rptr.2d 706] (*Warburton/Buttner*) ["Generally speaking, the issue of whether a court has subject matter jurisdiction over an action against an Indian tribe is a question of law subject to de novo review."].)

■ For state court jurisdiction to exist in these matters, the tribe's waiver of immunity must be clearly expressed as to its scope and applicability to disputes, and must be made by a person or entity authorized to do so. (*Warburton/Buttner, supra,* 103 Cal.App.4th 1170, 1182.) Under the *C & L Enterprises* decision (*C & L Enterprises, supra,* 532 U.S. 411), " 'while

---

[8] As we will show, that statement is not wrong as to the guaranty issues, but the tribal legislation also consented to suit in appropriate courts, with a waiver of jury trial, on the loan agreement disputes.

clarity of expression is essential to a tribe's waiver of immunity from suit, particular words of art are not.' " (*Warburton/Buttner, supra,* 103 Cal.App.4th 1170, 1185, quoting American Indian Law Deskbook (2d ed. 2002 supp.) Conference of Western Attorneys General, p. 68 (Deskbook).) These requirements that waivers of tribal immunity must be clear and express are not subject to flexible application nor disregard, even where the particular facts might justify a different conclusion. (*Ute Distribution Corp. v. Ute Indian Tribe* (10th Cir. 1998) 149 F.3d 1260, 1267.)

*Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407, 1418 [88 Cal.Rptr.2d 828] (*Great Western Casinos*), acknowledges the California approach to this specific type of jurisdictional problem allows a trial court deciding upon a claim of sovereign immunity to " 'engage in sufficient pretrial factual and legal determinations to " 'satisfy itself of its authority to hear the case' before trial." ' " (*Ibid.*; see *Smith, supra,* 95 Cal.App.4th 1, 7, fn. 8.) The reason for this rule is that the lack of subject matter jurisdiction can be raised at any time, and no specific procedural method is required to bring the matter to the court's attention. (*Great Western Casinos, supra,* at p. 1418.) Testimonial and documentary evidence relevant to the jurisdictional questions on sovereign immunity may be considered, as well as the pleadings and contract language. (*Ibid.*; *Smith, supra,* 95 Cal.App.4th at p. 7, fn. 8; *Warburton/Buttner, supra,* 103 Cal.App.4th 1170, 1181.)

If an appellate court is presented with a case in which the facts most relevant to the appeal are undisputed, it may resolve the question of law presented without regard to the findings of the trial court. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799–801 [35 Cal.Rptr.2d 418, 883 P.2d 960].) "However, by the same token, it may be necessary to determine the historical facts of a transaction in order to apply the pertinent legal principles." (*Warburton/Buttner, supra,* 103 Cal.App.4th 1170, 1181.)

### B. Types of Waiver and Rules for Document Interpretation

In *Warburton/Buttner, supra,* 103 Cal.App.4th 1170, 1183–1184, this court described the three general contexts in which the issue of a waiver by an Indian tribe of its sovereign immunity from suit will normally arise. (*Id.* at p. 1183, citing Deskbook (2d ed. 2000) ch. 7, § B, pp. 171–174.) These are (1) the effect of provisions in individual contracts, such as arbitration clauses; (2) such conduct by a tribe as taking certain legal positions during litigation (e.g., raising counterclaims or intervening in litigation); and (3) whether the tribal defendant was acting in a sovereign, as opposed to a corporate, status at the time the controversy arose. (*Warburton/Buttner, supra,* at p. 1183.)

■ In *Smith, supra*, 95 Cal.App.4th 1, the court set forth the view that an otherwise binding contract was effective to waive sovereign immunity, under the applicable tribal sovereign immunity ordinance, even where the explicit waiver was made by contract, instead of pursuant to a tribal ordinance or resolution. The court's analysis depended on several factors. First, the court did not "interpret the reference in the tribal ordinance to an 'explicit' waiver to mean that a resolution must use the magic words 'waiver' or 'sovereign immunity.' " (*Smith, supra*, at p. 9.) Rather, it was enough that the tribal council, with full knowledge of its terms, approved the contract by resolution, because this satisfied the purpose of the tribal sovereign immunity ordinance ("to ensure that no waiver of sovereign immunity is made by a single tribal officer, and that instead such waivers be made only by formal action of its governing body, the tribal council"). (*Ibid.*; see *Warburton/Buttner, supra*, 103 Cal.App.4th 1170, 1186–1187.)

In *Smith, supra*, 95 Cal.App.4th 1, the contractual waiver of sovereign immunity was held to be sufficient in light of the contract's adoption of California law and the arbitration method of dispute resolution, because the contract was negotiated by an authorized tribal representative, and was approved by tribal resolution. We likewise inquire into the negotiation and approval circumstances here.

The historical facts of these transactions include two basic sets of agreements, the loan agreement and the separate guaranty. Apparently, YAN is seeking to pursue the loan guaranty issues in its own tribal court arbitration scheme, which allows subsequent enforcement of any binding arbitration awards in the courts of the United States, Arizona, or other states having subject matter jurisdiction. Nation filed its Arizona action on that same basis. No issues about the loan guaranty, even as pled in the complaint, appear to be currently before us.

The original and first, second and third amended versions of the loan agreement documents admittedly contain limited waivers of sovereign immunity for resolution of disputes about the loan agreement, in which Nation agreed to Arizona choice of law, waiver of jury trial, allowing court trial in the courts of the United States, Arizona, "or other states having subject matter jurisdiction" (unless those courts refuse jurisdiction, in which case binding arbitration will result). For all of those amendments, there was previous legislative authorization to enter into limited waivers of sovereign immunity, to address the evolving casino construction problems. According to Chairman Hernandez's declaration, the amendments did not modify the jurisdictional and dispute resolution provisions in the original loan agreement, but the tribe chose to reaffirm its previous waivers of sovereign immunity pertaining to each agreement by enacting separate legislation.

General Council Resolution No. 07-31 relied on in other part in Chairman Hernandez's declaration, also states that under the original loan agreement, it shall not be necessary in litigation or arbitration arising from the loan agreement to defer to or exhaust remedies in tribal courts. It also gives the chairman and the tribal council additional authority as necessary to construct the casino, "provided however, the Chairman may not waive the tribe's sovereign immunity, consent to binding arbitration, and/or consent to the jurisdiction of any judicial forums without the approval of the General Council of the Tribe in accordance with the customs and traditions of the Tribe."

With regard to the fourth amendment, we should read it not only together with the previous versions of the loan agreement, but also take into account the evidence presented about the legislative actions taken by Nation to authorize the prospective contractual agreements and amendments. Specifically, LB-07-08 authorized the chairman to negotiate and execute amendments to the various casino loan documents in the best interests of Nation, by reason of the legal dispute between Nation and the contractors, under Nation's constitutional authorization for the chairman to negotiate and execute contracts. The fourth amendment is not a wholly new or independent contract, and it expressly ratified and affirmed the loan agreement and associated credit documents, stating they contained the entire understanding of the parties and were binding upon them.

With regard to the contractual type of waiver, the courts will look for the expressed intent of the parties, under an objective standard. (*Brant v. California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 744, pp. 830–833.) An appellate court's review of the trial court's construction of allegedly ambiguous contractual language depends on the circumstances. (*Warburton/Buttner, supra*, 103 Cal.App.4th at pp. 1180–1181, citing *Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 556 [32 Cal.Rptr.2d 676].)

Here, Nation admits that the language in both LB-07-08 and in the fourth amendment is ambiguous, as to the extent of authorization of the chairman to act on behalf of Nation in waiving immunity from suit. As stated in LB-07-08, the circumstances of the fourth amendment included a dispute with the contractors, and the need to amend the loan documents to fund a settlement with them, to enable the remainder of the loan agreement to go forward.

## C. YAN's Unusual Arguments and Their Underlying Premise

On appeal, YAN challenges the trial court's conclusion that California jurisdiction was unavailable, and argues it was error to find YAN failed to adequately show that the chairman had the authority to waive immunity, conferred on him by legislation that authorized the waiver in the fourth amendment. The nub of YAN's arguments is that the pleadings in the record disclose an adequate basis for California jurisdiction to be exercised over these loan agreement disputes, through the contractual language of the fourth amendment, as authorized by legislation by Nation. Nation responds that YAN's opposition to its motion to quash was improperly attempting to shift the burden to Nation, to show it had withheld such authority from the chairman.

■ At the hearing before the trial court, counsel for YAN mainly relied on the borrower's (Nation's) representations and warranties in the fourth amendment that the execution of the agreement and performance were duly authorized by all required actions on its behalf, and that it had approved a formal resolution approving the proposed fourth amendment and other related documents, pursuant to its tribal constitution, article 5, section 3. However, such facial representations and warranties, without more, are not enough to show there was an adequate waiver of immunity, because they might not be true, and any such claims of authorization do not themselves supply adequate proof of compliance with tribal law.

■ On appeal, YAN now makes different arguments, mainly relying on foreign nation sovereign immunity authorities, or corporate official authorities, to claim the fourth amendment contains a clear, unequivocal, express, authorized waiver of sovereign immunity. YAN is correct that, as recognized in *C & L Enterprises, supra*, 532 U.S. 411, 421, footnote 3, "reference to uniform federal law governing the waiver of immunities by foreign sovereigns [was instructive] in deciding whether a particular act constitute[d] a waiver of tribal immunity." (*Smith, supra*, 95 Cal.App.4th at p. 10.) "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58 [56 L.Ed.2d 106, 98 S.Ct. 1670].) However, Indian tribes represent a particular variety of a sovereign power, domestic dependent nations. (*Warburton/Buttner, supra*, 103 Cal.App.4th 1170, 1182.) In *C & L, Enterprises, supra*, 532 U.S. 411, 423, footnote 6, the court declined to reach any issue of authorization of a representative of a tribe to waive immunity.

On this motion to quash, the focus was on the burden of proof regarding authorization. We disagree with YAN's argument below that the face of the fourth amendment was enough to show an authorized waiver and thus jurisdiction. We also confess to some puzzlement as to YAN's current professed theory of subject matter jurisdiction, which cites to cases arising in very different immunity contexts. For example, it is unpersuasive for YAN to rely on *Brown v. O'Connor* (1851) 1 Cal. 419, a case invalidating an 1849 lease of lands by Catholic mission authorities, because the mission lacked good title to the land. Instead, the plaintiff was claiming title to the same property, based on a grant to him from a Mexican alcalde (governmental official) in 1842, made before statehood. The court reasoned that the Mexican alcalde had presumptive authority at the relevant time, and thus his grant of land was valid over the mission's competing claim. (*Id.* at p. 420.) While interesting, this case fails to shed much light upon modern sovereign immunity doctrine concerning Indian tribes, as developed since 1940, the date of the leading case, *United States v. U. S. Fidelity Co.* (1940) 309 U.S. 506 [84 L.Ed. 894, 60 S.Ct. 653] (dealing with the requirement for congressional authorization for suit against Indian tribes; see Deskbook (4th ed. 2008) ch. 7, § IA-B, pp. 288–315).

Likewise, YAN seems to be arguing that corporate official authority rules should be applied here, such that Nation must be bound by its chairman's apparent authority to make representations of authorized waiver in the fourth amendment. There are many cases dealing with the implied authority of executive corporate officials to bind a corporation for contracts that are within the usual scope of corporate business. (See 9 Witkin, Summary of Cal. Law, *supra*, § 109, pp. 886–887; *Grummet v. Fresno Glazed Cement Pipe Co.* (1919) 181 Cal. 509, 513 [185 P. 388] [ordinary contract of employment].) However, the current dispute must be analyzed under Indian tribal contracting requirements, and the chairman is a representative of the tribe, not of an ordinary corporation, or a tribal corporation. It is also unpersuasive for YAN to rely on the presumptions and burden-shifting provisions found in Evidence Code sections 604 and 606, in the context of a motion to quash, in which the plaintiff-opponent must demonstrate there is a basis for jurisdiction in the record.

Further, YAN weakly attempts to bring its case within the category of immunity waivers that are created through tribal participation in litigation, such as in *In re White* (9th Cir. 1998) 139 F.3d 1268, a bankruptcy case in which the tribe invoked jurisdiction by filing a claim. That case is not on point, where we are considering whether legislative and contractual authorized waivers allowing state court jurisdiction occurred. Its statement taken out of context, that nothing in the record suggested what tribal approvals were necessary there, does not help us in interpreting the documents before us. (*Id.* at p. 1271.)

Moreover, it does not appear that YAN is making any argument that within the meaning of the fourth amendment, which granted the chairman the power to make casino contract arrangements in the "best interests" of the tribe, this power alone authorized the chairman to waive immunity, if he believed it to be in the "best interest of the Nation."

Since the authorities directly cited by YAN are inapposite, we need not address Nation's argument that new authorities, contrary to the theory of trial, are being cited on appeal. (See *In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 117 [95 Cal.Rptr.2d 113] [rejecting grounds for relief advanced for the first time on appeal because "[i]t is well established that issues or theories not properly raised or presented in the trial court may not be asserted on appeal, and will not be considered by an appellate tribunal"].)

Instead, we pursue a de novo analysis of the record to assess whether, taken as a whole, it discloses there is an adequate basis for California jurisdiction to be exercised over these loan agreement disputes, through any authorized fourth amendment dispute resolution procedure.

### D. Authorities on Effective Waivers of Tribal Sovereign Immunity

█ On de novo review of the ruling, we turn to the underlying premise of YAN's appeal, that an effective waiver of sovereign immunity was created in the fourth amendment, as authorized by LB-07-08. In the trial court's ruling, it relied on a group of cases holding that a tribal official cannot waive immunity without authorization. Understandably, the trial court was cautious in venturing into an area in which tribal sovereignty operates. The trial court first correctly stated that the power to contract does not necessarily include the power to waive immunity, any waiver must be executed by those with the constitutional power to act on behalf of the tribe, and "[t]he issue is whether the waiver was 'authorized by tribal law.' "

In *Hydrothermal, supra,* 170 Cal.App.3d 489, 496, it was held that a tribal chairwoman's signature on a contract could not operate to waive the tribe's immunity from suit, because the tribe had not expressly delegated the chairwoman that power, and additionally, there was fraud in the inducement. That was not a case of numerous legislative approvals for amended documents throughout the same transaction, but rather there was no showing of any previous authorization from the tribe's governing body for a particular contract, entered into under pressure.

In *World Touch Gaming, supra*, 117 F.Supp.2d 271, the defendant tribe had delegated authority to operate its casino to a management company pursuant to a management agreement. The appeal turned on capacity to waive immunity, and whether the sales agreement between the plaintiff vendor and the management company effectively waived sovereign immunity. (*Id.* at p. 273, fn. 2.) The court said no, because the provision in the management agreement giving the company exclusive control over the day-to-day operations of the casino was not an authorization to waive the tribe's sovereign immunity. Instead, "the unequivocal language of the Tribe's Constitution and Civil Judicial Code" provided that only the tribal council could waive the tribe's sovereign immunity, expressly, and the signatory to the agreement did not have such power delegated to him. (*Id.* at p. 275.) The waiver of sovereign immunity from suit could not be made by a tribal defendant acting in a corporate capacity, not a sovereign capacity, at the time the controversy arose. (See *Warburton/Buttner, supra*, 103 Cal.App.4th at p. 1183.)

In *Danka Funding, supra*, 747 A.2d 837, the finding of immunity was based on a lack of authorization by the tribe's comptroller, in executing a lease containing a forum selection clause, to additionally waive sovereign immunity. (*Id.* at p. 841.) There was evidence that only the tribal council " 'has the power to waive the sovereign immunity of the Pueblo [Tribe] of ACOMA or by resolution, to authorize the Governor or his designate to waive the sovereign immunity . . . as limited in the resolution.' " (*Id.* at pp. 841–842.) No such designation was made in that case. Individuals cannot enter into a contract on behalf of a tribe, without the knowledge of the tribal council that actually had the power to contract. (*Sanderlin v. Seminole Tribe of Florida* (11th Cir. 2001) 243 F.3d 1282, 1288–1289.) The court commented that businesses dealing with Indian tribes are charged with knowledge of sovereign immunity doctrines and of the legal requirement for enforceable waivers of immunity. (*Danka Funding, supra*, at p. 842.)

Our task is to apply these principles to the factual and procedural context before us, to decide if the methods used in these transactions arguably constituted a clear and express waiver of Nation's sovereign immunity, to justify the exercise of California jurisdiction. Contractual waivers of sovereign immunity are enforceable where they were executed by persons authorized to do so and where the necessary formalities were adequately observed. (*C & L Enterprises, supra*, 532 U.S. 411, 422–423.) No magic words are required, and an adequate waiver of sovereign immunity need not be phrased with only those particular terms (waiver/sovereign immunity). (*Smith, supra*, 95 Cal.App.4th at p. 9.)

## E. Analysis

This record contains complex documents containing numerous subparts, and the briefs are of little assistance in interpreting them. Nation's copy of the tribal constitution was not authenticated, and Nation admits the relationship of the fourth amendment and LB-07-08 is somewhat ambiguous in nature as to the waiver of immunity. Nor did YAN demonstrate what specific tribal law restricts or governs waivers, other than by citing to the "customs and traditions" of the tribe, as referenced in various resolutions in the record. We first examine the first three sets of amendments, then ask, to what extent were the fourth amendment dispute resolution terms (and the applicable legislation) different from the previous terms in the loan agreement? This is important to determine if the record shows Nation consented to the specific terms of the fourth amendment, as negotiated by the chairman.

With regard to the terms of the previous versions of the loan agreement, it is clear on the current record that Nation waived its sovereign immunity "irrevocably" with regard to submitting to court jurisdiction for disputes over the loan agreement. The purpose of the fourth amendment was to settle the dispute with the contractors, by amending the ongoing loan agreement to raise funds for settlement, and no purpose was stated to undo the previous loan arrangements or retract "irrevocable" immunity waivers.

We conclude that under the fourth amendment, the agreed-upon court jurisdiction may include California for numerous reasons. First, the trial court misspoke in the ruling to say that Nation consented to suit according to the terms of the tribal dispute resolution methods only. Those methods are set out in the loan guaranty transaction (SARLG), whereas the loan agreement transaction contained its own separate provisions for a jury trial waiver and court enforcement of arbitration awards. Nation has not explained why the loan guaranty provisions for tribal dispute resolution should control over the underlying loan agreement, as amended. Nation has conflated the portions of the legislation referring to the loan guaranty, when it is arguing issues about the loan agreement.

Although there are references to the loan guaranty transactions in the earlier legislative materials, they cite to tribal dispute resolution, and we have been given no reason to assume that the guaranty provisions control over the loan agreement. The parties do not appear to argue that the January 2009 purchase by YAN of the Banks' interests in the loan agreement somehow combined YAN's separate legal statuses as to the two forms of agreement, thus somehow throwing the entire case into tribal court. Instead, they each selectively cite to portions of the legislation, without attempting to reconcile its broad scope of coverage of both types of agreement.

As relevant here, the loan agreement, originally and as amended through the third amendment, consistently states that Arizona law is chosen, jury trial is waived, and Nation waives its sovereign immunity from any suit or proceeding in any forum, including any confirmation of arbitration awards with respect to the agreement and the transactions. Nation admits it consented there to the jurisdiction of the courts of the state of Arizona, United States courts, "and the courts of any other state that may have jurisdiction over the subject matter, over any such action, and over Borrower." In the event that the lenders (Banks) require arbitration, or if the Arizona courts or the United States courts decline to hear the action, an arbitration clause set forth can then be invoked, and judgment may be entered on any arbitration award "in any court of competent jurisdiction," including Nation's courts.

The legislation for the original, second and third amendments of the loan agreement expressly refers to its "irrevocable" limited waiver of Nation's sovereign immunity from actions brought by the Banks in this transaction, and repeat the dispute resolution provisions from the loan agreement (including judicial enforcement of any arbitration award, in the courts of the United States, the state of Arizona, and other courts of competent jurisdiction for the enforcement of binding arbitration awards).

Moreover, Nation's General Council Resolution No. 07-31 dated July 1, 2007, refers to modification of the bank loans and states that consistent with the original loan agreement, it shall not be necessary in litigation or arbitration arising from the loan agreement to defer to or exhaust remedies in tribal courts. General Council Resolution No. 07-31 grants the chairman and the tribal council additional authority as necessary to construct the casino, "provided however, the Chairman may not waive the Tribe's sovereign immunity, consent to binding arbitration, and/or consent to the jurisdiction of any judicial forums without the approval of the General Council of the tribe *in accordance with the customs and traditions of the tribe.*"

Those legislative provisions must be read in light of other legislation expressly stating that although the chairman's power to waive sovereign immunity is not unlimited, the delegation of power to him to enter into amendments to the casino documents allowed him to do so in a manner that is "consistent" with and "subject to" the provisions of the resolution, which must include those that have already been enacted and that irrevocably waived Nation's immunity on the loan agreement transactions.

With regard to the specific terms of the fourth amendment, they expressly ratified and affirmed the earlier loan agreement and associated credit documents, stating they contained the entire understanding of the parties and were binding upon them. However, in section 3 of the fourth amendment, the

parties replaced article XV, the dispute resolution and sovereign immunity provisions of the previous loan agreement versions. The new article in the fourth amendment is similar, retaining the loan agreement's Arizona choice of law provision and the waiver of jury trial. It then states that if any legal proceedings are filed in California courts, claims may be determined by a general reference proceeding under Code of Civil Procedure sections 638 through 641.2. As the borrower, Nation waived its sovereign immunity from actions in any forum, including arbitration, regarding the loan agreement transactions. Additionally, Nation/borrower consented to the jurisdiction of the Arizona state courts, California state courts, the courts of the United States, and the courts of any other state that may have jurisdiction over the subject matter, the action, and borrower. In the event that the courts decline to hear the action on jurisdictional grounds, arbitration is prescribed, and judgment on any arbitration award may be entered in the courts of Arizona, California, the United States, or any other court, including but not limited to Nation's courts.

The introduction of the California referee procedure under Code of Civil Procedure section 638 et seq. is not inconsistent with the earlier versions of the agreement, which allowed judicial enforcement of arbitration awards in any appropriate court having subject matter jurisdiction (possibly California). It added protections of judicial review of the referee's decision. (Code Civ. Proc., § 638 et seq.) That portion of the amendment could reasonably be interpreted as being in the best interests of Nation, consistent with the legislative declarations in LB-07-08. None of these terms retracted the waivers already made.

With regard to the chairman's authorization to enter into the fourth amendment, Nation's LB-07-08 (enacted Oct. 8, 2008) authorized the chairman, due to the legal dispute between Nation and the contractors, "to negotiate and execute amendments to the various casino loan documents in the best interests of [N]ation." In the authorization portion of the bill, Nation's constitution is cited as allowing the First Legislature the power to authorize the Chairman to negotiate and execute contracts on its behalf. Authority to contract is not the same as authority to waive immunity, but at that point, there were already existing waivers in place for the previous loan agreement versions, and the fourth amendment continued them.

 It is not dispositive on these scope of authority issues that the tribal constitution was not properly brought before the trial court. A tribal constitutional provision is not self-enforcing or always definitive, but must be read in light of other significant jurisdictional factors. (*Warburton/Buttner, supra*, 103 Cal.App.4th 1170, 1186; *Smith, supra*, 95 Cal.App.4th at p. 10, fn. 9.) Always, "[t]he proper inquiry is whether a waiver of sovereign immunity was

effected by one with the authority to do so." (*Warburton/Buttner, supra*, 103 Cal.App.4th 1170, 1186, citing *Smith, supra*, 95 Cal.App.4th at p. 10, fn. 9.)

Nation argues that since it chose to expressly reaffirm its previous waivers of sovereign immunity pertaining to earlier amendments, by enacting separate legislation, it must have been required to do so again in LB-07-08, when authorizing the fourth amendment, in order to reiterate the existing waivers, according to its custom and traditions. However, the express purpose of the fourth amendment was to enable Nation to go forward with the entire set of transactions by monetarily settling a dispute. Since the earlier legislative authorizations of the amended loan agreement recited that the authorizations were being performed in accordance with the customs and traditions of Nation, and the same sequence of events was followed for legislation and enactment of the fourth amendment, there is some existing support in the record that the timing of the enactment of the fourth amendment complied with the customs and traditions of Nation, even though a few months, not a few weeks, elapsed between the October 2008 legislative authorization for the fourth amendment to the loan documents, and the actual execution of the fourth amendment in January 2009.

 To defeat the motion to quash and show that California qualified as a forum court defined in the fourth amendment's new article XV, YAN did not have to show in more detail Nation's compliance with the customs and practices of the tribe to authorize the ongoing waiver. By reference to the terms of the exhibits to the complaint and declarations, YAN carried its burden of proving by a preponderance of the evidence that jurisdiction of the California court in fact exists. (*Lawrence, supra*, 153 Cal.App.4th 1364, 1369.) The fourth amendment did not displace earlier agreements. As such, the earlier waivers of sovereign immunity for the loan agreement transactions remained intact, and no separate legislative authorization to create a new one was required under Nation's customs and traditions as shown to the trial court.

 Moreover, even during subject matter jurisdiction disputes, the trial courts have the power to make interim orders and to provide for the progress of the case, pending resolution of the jurisdictional questions. (*Great Western Casinos, supra*, 74 Cal.App.4th at pp. 1418–1419; *Warburton/Buttner, supra*, 103 Cal.App.4th 1170, 1190–1191.) If it becomes evident that a basis for California jurisdiction is lacking, the trial court can revisit the issue. At this time, we determine only that on this record, the court erred in granting the motion to quash, because the fourth amendment is sufficiently consistent with the earlier versions of the loan agreement for court jurisdiction to exist here.

## DISPOSITION

The order granting the motion to quash is reversed. Each party shall bear its own costs on appeal.

Benke, Acting P. J., and Haller, J., concurred.