Filed 7/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ROBERT FINDLETON,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>COYOTE VALLEY BAND OF POMO INDIANS,<br><br>　　　Defendant and Respondent. | A142560<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVG1259929) |

　　　This appeal requires us to determine whether a Native American tribe known as the Coyote Valley Band of Pomo Indians (the Tribe) validly waived its sovereign immunity for purposes of the enforcement by construction contractor Robert Findleton (Findleton) of arbitration provisions in contracts between them. Findleton claims the Tribe waived its sovereign immunity when its Tribal Council entered into, and then amended, contracts with Findleton containing arbitration clauses and also adopted a resolution expressly waiving sovereign immunity to allow arbitration of disputes under the contracts. The Tribe disagrees, arguing the Tribal Council lacked authority to waive the Tribe's immunity and therefore any such waivers were invalid, because the power to waive the Tribe's immunity had not been properly delegated to the Tribal Council in accordance with the procedures specified by the Tribe's constitution. The superior court agreed with the Tribe and held that it lacked jurisdiction over Findleton's claims because there had been no valid waiver of the Tribe's sovereign immunity. Findleton appealed.

　　　The issue is one of law, which we review de novo. We disagree with the trial court and conclude that the Tribal Council was authorized to, and did, waive the Tribe's

1

sovereign immunity for purposes of arbitrating disputes arising under the Tribe's contracts with Findleton.  We therefore reverse.

## I.

## FACTUAL BACKGROUND[1]

The Tribe's governance is carried out by two bodies:  the General Council, which its constitution establishes as "[t]he governing body of the Band" and consists of all tribal members 18 years of age or older, and the Tribal Council, an elective body consisting of seven members of the General Council whose powers are more narrowly circumscribed than those of the General Council.  The Tribe's constitution does not permit the Tribal Council to waive the Tribe's sovereign immunity without the General Council's "consent" and "prior approval."  This appeal requires us to decide whether the General Council validly delegated its authority to waive the Tribe's immunity to the Tribal Council.

### A. *Resolution 07-01*

The first of the delegations of authority in question was adopted on June 2, 2007, at a special meeting of the General Council of the Tribe, when the Council adopted a resolution entitled, "General Council Delegation of Authority to the Tribal Council to Waive on a Limited Basis the Sovereign Immunity of the Tribe."  The resolution, known as Resolution 07-01, had been placed on the agenda and raised to the floor for a vote by the Tribal Chief.  It contained a series of prefatory recitals, which identified the Tribe's constitution and stated that the constitution provided that the General Council was the Tribe's governing body, and conferred on the Tribal Council various powers, including the power to negotiate contracts and conclude agreements on behalf of the Tribe, to borrow money and secure debt with Tribal assets, to engage in business activities and projects to promote the economic well being of the Tribe and its members, and to take actions necessary to carry out those powers.  The resolution further acknowledged that

---

[1] The recitation of the facts is derived from the record and appellant Findleton's opening brief.  Respondent the Tribe has not provided any statement of facts or challenged any of the facts recited here in its brief.

2

the constitution reserved to the General Council the power to waive the tribe's sovereign immunity from suit but that it also authorized the General Council to delegate that power to the Tribal Council.

With regard to the specific circumstances, the resolution recited that the Tribal Council had authorized development of a new gaming and resort facility and related infrastructure to support the gaming facility and the Tribal community (the Project), that the Project consisted of a casino and hotel complex within the Tribe's reservation, that the Project would require financing and hiring of architects, consultants and contractors to construct the Project, and that "[c]ontractual transactions favorable to the Tribe generally require that the Tribe waive on a limited basis its sovereign immunity in order to attract other individuals and entities to do business with the Tribe." Because it was "impractical for the General Council to meet and approve individual waivers of the sovereign immunity of the Tribe as each contract related to financing and development of the Project is entered into," the General Council had "determined . . . that it is necessary and in the best interests of the Tribe for the General Council to delegate to the Tribal Council its authority to waive the sovereign immunity of the Tribe in connection with contracts related to the financing and development of the Project."

As relevant here, the General Council therefore resolved in Resolution 07-01 that it "hereby delegates to the Tribal Council authority to waive on a limited basis the sovereign immunity of the Tribe in contracts of the Tribe approved by the Tribal Council . . . as determined necessary by the Tribal Council for the financing and development of the Project."[2]

### B. *The Construction and On-Site Rental Agreements*

In October 2007, the Tribe entered into an agreement with Terre Construction, a dba of Findleton, to construct improvements on the Tribe's reservation in Mendocino

---

[2] The General Council also resolved that "any limited waiver of sovereign immunity shall: 1) provide for arbitration of disputes; 2) avoid dispute resolution in state courts; 3) limit recourse solely to casino assets; and 4) shall not allow recourse to assets owned by individual members of the Tribe." These provisions are not at issue on appeal.

County, California, in preparation for construction of a new gaming facility (the Construction Agreement). The Construction Agreement, which was prepared by the Tribe, was a form agreement for construction projects issued by the American Institute of Architects (AIA) with various modifications. It was signed by Findleton as Contractor and by the Tribe's Chairman, John Feliz, Jr., on behalf of the Tribe.

The Construction Agreement contained provisions regarding "Claims and Disputes," which provided among other things that "[a]rbitration shall be held in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise." It provided that "[t]he foregoing agreement to arbitrate . . . shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof," and that "[t]he award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." Immediately following the arbitration provisions was a section stating: "No term or provision in this Agreement shall be construed as a waiver of the sovereign immunity of the Coyote Valley Band of Pomo Indians. The Parties specifically agree that the sovereign immunity of Coyote Valley Band of Pomo Indians shall not be waived for disputes or other matters related to this Agreement." Under the heading "Miscellaneous Provisions," the Construction Agreement contained a choice-of-law provision stating that it "shall be governed by the law of the Coyote Valley Band of Pomo Indians," that "[i]f a particular issue is not covered by such law, federal law shall govern" and that "[t]he Contractor agrees to the jurisdiction of the Coyote Valley Band of Pomo Indians."

In view of the choice-of-law provision, before entering the agreement Findleton requested that the Tribe "produce any documents, any laws or regulations that might be in place."[3] The members of the Tribe with whom he negotiated told him that "if there

---

[3] Findleton testified that the agreement originally referred only to the Tribe's laws, but at his request it was clarified to state that if no tribal law covered an issue it would be governed by federal law.

4

were any laws and codes, that they would be produced." The Tribe members did not provide him any tribal codes or laws despite his asking "several times," which led him to understand that there were none "in effect at that time and, therefore, the federal or other contractual agreements, arbitration and so forth, would apply." Initially, when he asked, they told him they were " 'checking on that,' " but later he "was specifically told that they . . . had gotten rid of most of their laws and ordinances and that there wasn't something in place at that time."

In November 2007, the Tribe and Findleton, under a dba called "On-Site Equipment," entered into a second agreement entitled "On-Site Equipment Master Rental Contract," which was "an abstraction of our standard master rental contract" that was prepared by "the Tribe and the Tribe's attorney" (the Rental Contract). The Tribe had proposed this agreement so that it could require all contractors doing work on the project to rent their equipment from Findleton on the reservation because by doing so those contractors would avoid state sales taxes.

The Rental Contract, like the Construction Agreement, contained an arbitration clause stating that "[c]laims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise." The Rental Contract similarly provided for specific enforcement of the agreement to arbitrate "in accordance with applicable law in any court having jurisdiction thereof," and stated the arbitrator's award would be final and similarly enforceable in court. And it stated that "[t]he Parties specifically agree that the sovereign immunity of Coyote Valley Band of Pomo Indians shall not be waived for disputes or other matters related to this Agreement."

The scope of work under the original Construction Agreement was approximately $1.6 million, but the parties twice agreed to increase the scope of work, first in November 2007 (to $3.6 million) and then in January 2008 (to $4.8 million).

5

## C. *Resolution 08-01*

Thereafter, a second delegation of authority to waive sovereign immunity was adopted, on March 1, 2008, when the General Council held a special meeting and adopted Resolution 08-01, entitled "General Council Delegation of Authority to the Tribal Council to Waive on a Limited Basis the Sovereign Immunity of the Tribe."

Resolution 08-01 contained the same recitals and resolutions as Resolution 07-01. In addition, it contained a recital stating: "It has been determined by the General Council that it is necessary and in the best interests of the Tribe to ratify the Tribe's waiver of sovereign immunity in connection with its existing contracts and to reconfirm the Tribal Council's, and otherwise delegate to the Tribal Council, authority to waive the Tribe's sovereign immunity in connection with contracts negotiated and concluded by the Tribal Council in furtherance of the Project." It resolved among other things that "the General Council hereby ratifies, confirms, approves and adopts all existing contracts of the Tribe related to the development, financing, and operation of the Project, and specifically ratifies, confirms, approves and adopts all waivers of sovereign immunity of the Tribe in such contracts," and that "the General Council, for clarification purposes, hereby reconfirms the authority of, and otherwise delegates authority to, the Tribal Council, to be exercised by the majority vote of all members of the Tribal Council as evidenced by an appropriate Tribal Council resolution, to waive the Tribe's sovereign immunity in contracts of the Tribe approved by the Tribal Council, as determined necessary in the discretion of the Tribal Council, upon advice of counsel, and in furtherance of the best interests of the Tribe."[4]

---

[4] The copy of Resolution 08-01 offered by Findleton, like Resolution 07-01, contains a "Certification" stating that a special meeting of the General Council was "duly called, noticed and convened" on the relevant date, that "a quorum was present," and that "this resolution was adopted by a vote of: ___ for, ___ against, 0 abstaining." In 07-01, the numbers of votes for and against are listed; in 08-01, the spaces for those numbers are left blank. Both resolutions are signed by Jaime Naredo as Tribal Chief and John Feliz, Jr. as Tribal Chairman.

**D.** *Suspension of Construction, Amendment of Agreements and Adoption of Tribal Council Resolution.*

In August 2008, ten months after the Tribe and Findleton entered into the Construction Agreement, the Tribe gave Findleton notice it was suspending construction of the Project because the financial meltdown had adversely affected its ability to secure financing. The notices assured Findleton and other contractors that "[u]pon securing sufficient Project financing, the Tribe intends to pay all contractors, subcontractors, design professionals, and other services providers involved in the Project all outstanding fees and expenses" and that the Tribe would endeavor to obtain additional financing sufficient to complete the casino project. The notice letter requested Findleton's and other contractors' "patience in this matter."

Shortly after the Tribe's suspension of construction, Findleton met with four Tribe members, including the Tribal Treasurer, Tribal Administrator and Acting Construction Manager. After the meeting, he sent a letter to the Tribal Chairman summarizing the meeting and a proposal he had made to the Tribe under which he would continue to provide services for the next three months (from August through October 2008). Per that proposal, Terre Construction would perform additional work in the amount of approximately $527,000, the Tribe would execute a Third Amendment to the Agreement to include that work, Findleton would defer payment for that work until 2009, the Tribe would make payments in 2009 with interest at 6.5 percent, and the Tribe would issue a resolution accepting these terms and also including a limited waiver of sovereign immunity.[5] Findleton included a document entitled "Third Amendment to Agreement" with the proposal. It recited the terms of the existing Construction Agreement and prior amendments, and described the additional work and its costs.

Findleton was told by tribe members that the proposal (with the Third Amendment) was presented to and approved by the Tribal Council. Findleton was also

---

[5] Findleton asked about, and the Tribe members explained, the process they had to follow to obtain immunity, including that General Council Resolution 08-01 authorized the Tribal Council to waive immunity by Tribal Council resolution.

told that the proposal would be (and later that it had been) presented to the General Council. The Chairman, John Feliz, Jr., signed the Third Amendment on August 20, 2008.

That same day, the Tribal Council adopted Resolution No. CV-08-20-08-03 (Tribal Council Resolution) by a unanimous vote. That Resolution stated that pursuant to the previously adopted General Council Resolution 08-01 authorizing the Tribal Council to waive the Tribe's sovereign immunity on a limited basis in contracts related to development and financing of a new gaming and resort facility and related infrastructure and utilities, the Tribal Council was waiving sovereign immunity as between the Tribe and Terre Construction. The waiver was limited to arbitration of disputes in order to avoid litigation in state court, and recourse was limited to casino assets and not to assets owned by individual members of the Tribe.

Findleton was presented with the Tribal Council Resolution as the limited sovereign immunity waiver he had requested, which resolution referred to General Council Resolution 08-01. He was told that 08-01 provided the authority for the Tribal Council to waive the Tribe's sovereign immunity.

E. *Findleton's Performance, the Tribe's Nonpayment and the Ensuing Dispute*

After receiving the Tribal Council Resolution, Findleton performed the work called for in the Third Amendment. The Tribe failed to pay Findleton for this work (and apparently for some prior work) in 2009 or thereafter. However, tribal officials repeatedly acknowledged the Tribe's obligation to pay and promised it would pay him once it had the ability to do so. Subsequently, though, the Tribe (through counsel) advised Findleton the Tribe would not pay, for various reasons. After making some additional efforts to get paid, Findleton eventually served the Tribe with a request for mediation and demands for arbitration pursuant to the Construction and On-Site Rental Agreements. The Tribe did not respond to either.

8

## PROCEDURAL HISTORY

On March 23, 2012, Findleton filed a petition to compel mediation and arbitration seeking to enforce the mediation and arbitration clauses in the Construction Agreement and the On-Site Rental Contract. The petition attached the agreements and alleged that the Band had failed to pay Findleton $831,483.53 owed under the Construction Agreement and $94,712.23 under the On-Site Rental Agreement, exclusive of interest, that Findleton had requested mediation under the agreements as a precondition to arbitration and that the Band had refused to proceed with mediation or arbitration. It sought an order compelling mediation and directing the parties to submit their disputes to arbitration if they were unable to resolve them through mediation.

On April 20, 2012, the Tribe filed a motion to quash service of the summons and to dismiss for lack of subject matter jurisdiction on the grounds that the Tribe had not waived its sovereign immunity or consented to suit in the state court and that Findleton's failure to exhaust his tribal administrative remedies deprived the court of jurisdiction.

The Tribe argued that although the agreements between Findleton and the Tribe contained arbitration clauses, the Chairman of the Tribal Council who had signed the agreements lacked authority to enter into them on behalf of the Tribe, or to waive the Tribe's sovereign immunity. It also argued that Findleton had failed to comply with a claims ordinance because he had not submitted the claim within 180 days of when the Tribe had failed to pay him for his work under the amended agreement in 2009. In its reply brief, the Tribe argued as relevant here that the General Council Resolution (07-01) purporting to delegate the power to waive the Tribe's immunity was not effective because the Tribe's constitution required that any waiver of immunity had to be accomplished through the initiative or referendum process, and that the resolution did not satisfy that requirement. Because the Tribal Council therefore lacked authority to waive immunity, it could not have waived immunity by entering into agreements with arbitration clauses.

Extensive discovery then ensued regarding these topics, followed by additional briefing.

Eventually, the trial court heard the motion on March 14, 2014. The court issued a written ruling granting the motion to quash and dismiss on May 19, 2014. The court overruled certain evidentiary objections. It held the arbitration clauses in the agreements did not waive the Tribe's sovereign immunity because of the language in the agreements stating that the Tribe does not waive immunity. It held that the Tribe did not waive its immunity through the series of resolutions or amendment to the agreements either. General Council Resolution 07-01 was not a waiver, the court held, for three reasons: First, it "purports to be a limited waiver of sovereign immunity for purposes of obtaining financing for the casino project only." Second, it "was adopted prior to the Band contracting with Plaintiff and would have no force and effect as to Plaintiff's contract." Third, "[t]here was deposition testimony from both the Tribal Chair and the current Chief that this resolution was not adopted in accordance with the initiative/election provisions set forth in the Constitution." General Council Resolution 08-01 was "insufficient evidence of a valid waiver" because, first, "[t]his resolution . . . lacks sufficient information regarding the vote count," and second, "[a]gain there was testimony that this Resolution was not adopted in accordance with the initiative/election provisions set forth in the Constitution." The court found the Tribal Council Resolution was adopted at a duly convened meeting of the Tribal Council and that the third amendment to the Agreement was signed by the parties. These did not constitute a waiver because, again, "[a]ccording to testimony, the resolutions adopted by the General Council admittedly were not done in accordance with the provisions set forth in the Constitution," which the court read as requiring the use of the initiative process by the General Council. As a result, there was no valid delegation to the Tribal Council and its waiver in the Tribal Resolution was thus "done without the requisite authority." Given its holding on the waiver issue, the court found it unnecessary to reach the Tribe's argument that Findleton failed to exhaust administrative remedies under the Tribe's claims ordinance. An order granting the motion was filed on June 19, 2014. On July 22, 2014, Findleton filed a timely notice of appeal.

10

## III.

## ANALYSIS

### A. *Legal Principles Governing Waiver of Tribal Sovereign Immunity*

Indian tribes enjoy sovereign immunity "from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation." (*Kiowa Tribe v. Manufacturing Tech.* (1998) 523 U.S. 751, 760 (*Kiowa* ).) "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its [sovereign] immunity." (*Id.* at p. 754.) "[T]o relinquish its immunity, a tribe's waiver must be 'clear.' " (*C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe* (2001) 532 U.S. 411, 418 (*C&L*).)**[6]** For a waiver to be effective, it "must be made by a person or entity authorized to do so." (*Yavapai-Apache Nation v. Iipay Nation of Santa Ysabel* (2011) 201 Cal.App.4th 190, 206 (*Yavapai*).) A party claiming a tribe has waived its sovereign immunity bears the burden of proof on the issue. (*Id*. at p. 205.)

"Generally speaking, the issue of whether a court has subject matter jurisdiction over an action against an Indian tribe is a question of law subject to de novo review." (*Warburton*, *supra*, 103 Cal.App.4th at p. 1180.) In interpreting tribal laws, and determining "whether a waiver of sovereign immunity [has been] effected by one with the authority to do so," we apply federal law. (*Id*. at p. 1188; *Smith v. Hopland Band of Pomo Indians* (2002) 95 Cal.App.4th 1, 10, fn.9; *California Parking Services, Inc. v. Soboba Band of Luiseño Indians* (2011) 197 Cal.App.4th 814, 820 (*California Parking*); see also *Kiowa*, *supra*, 523 U.S. at p. 756 ["tribal immunity is a matter of federal law and is not subject to diminution by the States"].) "[T]he interpretation and construction of a written instrument . . . may be conducted de novo where '(a) the trial court's contractual interpretation is based solely upon the terms of the written instrument without the aid of

---

**[6]** "It must be recognized that 'sovereign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation.' " (*Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1182 (*Warburton*).) "Rather, it presents a pure jurisdictional question." (*Ibid*.)

extrinsic evidence; (b) there is no conflict in the properly admitted extrinsic evidence; or (c) the trial court's determination was made on the basis of improperly admitted incompetent evidence.' " (*Warburton*, at p. 1180.) "With regard to the contractual type of waiver, the courts will look for the expressed intent of the parties, under an objective standard." (*Yavapai*, *supra*, 201 Cal.App.4th at p. 209.)

### B. *Findleton's Factual Showing*

Appellant Findleton, who bore the burden of proof in this case, demonstrated that the General Council, by majority vote at a special meeting, adopted Resolution 07-01, delegating to the Tribal Council the authority to waive the Tribe's sovereign immunity prior to the time the parties executed the Construction and On-Site Rental Agreements. He offered the agreements, which contained arbitration clauses but also language indicating there was no waiver of sovereign immunity. He offered Resolution 08-01, in which the Tribe reconfirmed its delegation to the Tribal Council of the authority to waive the Tribe's immunity after the agreements were executed, ratified all existing contracts of the Tribe related to the development of the Project (which would include the Construction and On-Site Rental Agreements), and ratified all waivers of sovereign immunity of the Tribe in such contracts.

Besides the Construction Agreements and General Council resolutions, Findleton also offered evidence of his meeting, after suspension of work on the Project, with Tribal officials, at least some of whom were members of the Tribal Council; his proposal to them, as discussed at the meeting, for him to continue certain work on the Project and to defer payment on that work, including his request for a Tribal Resolution accepting the proposal and including a waiver of sovereign immunity; the Tribal Chairman's signing of the proposed amendment submitted with the proposal; and the Tribal Council's adoption of the Tribal Council Resolution accepting Findleton's proposal, approving the amendment and consenting to a waiver of the Tribe's sovereign immunity including provisions for arbitration of disputes, avoiding dispute resolution in state courts, limiting recourse to casino assets and not allowing recourse to assets owned by individual members of the Tribe.

## C. *Preliminary Issues*

Preliminarily, we address several aspects of the trial court's written ruling regarding Resolutions 07-01 and 08-01 with which we disagree. First, as already indicated, the trial court characterized Resolution 07-01 as "purport[ing] to be a limited waiver of sovereign immunity for purposes of obtaining financing for the casino project only." This is inaccurate in three respects. The resolution does not limit the delegation of authority to waive immunity to the purpose of "obtaining financing." Rather, as Findleton points out, it delegates authority to waive immunity "in contracts of the Tribe approved by the Tribal Council . . . for the financing *and development* of the Project" and acknowledges the need for the Tribe to hire, among others, "general contractors to construct the Project." (Italics added.) Second, the authority is not limited to the "casino." The resolution defines the Project as "the development of a new gaming and resort facility *and related infrastructure and utilities to support the new gaming facility and the Tribal community*." (Italics added.) Third, the resolution does not "purport[] to *be* a limited waiver of sovereign immunity"; rather, it purports to "*delegate*[] to the Tribal Council authority to waive" immunity in the future. (Italics added.)

The trial court also opined that Resolution 07-01 did not affect the contracts between Findleton and the Tribe because it "was adopted prior to the Band contracting with Plaintiff." The trial court failed to explain, and we are at a loss to understand, why the Tribe could not prospectively either waive immunity, or more accurately, delegate the authority to waive immunity.

We also have difficulties with the trial court's treatment of Resolution 08-01, including its conclusion that this resolution "is insufficient evidence of a valid waiver" in part because of "the lack of any recordation of a vote count" on the certification portion of the document. As with Resolution 07-01, Findleton did not contend that Resolution 08-01 was a waiver; rather, he argued that it (and Resolution 07-01) was a *delegation* of the authority to waive sovereign immunity to the Tribal Council. In any event, the blank spaces for a vote count are irrelevant. The document contains a "Certification," signed by both the Tribal Chief and Tribal Chairman four days after the

13

meeting at which it was considered, attesting to the fact that the resolution was "adopted" by a vote at a duly noticed meeting of the General Council "where a quorum was present." Their certification that it was "adopted" is circumstantial evidence it had garnered the necessary majority vote. Direct evidence of the actual vote count was not necessary. Moreover, the Tribal Council Resolution (CV-08-20-08-03), which the Tribe conceded was authentic and adopted, specifically describes General Council Resolution 08-01 as a resolution through which "the General Council *authorized* the Tribal Council to waive the Tribe's Sovereign Immunity on a limited basis." (Italics added.) Taken together, this evidence is sufficient to provide prima facie proof of those facts. The Tribe made no effort to rebut this showing: none of its declarations—including that of Tribal Chairman Feliz, who signed the document, that of the tribal secretary or that of the Tribe's counsel—so much as addresses Resolution 08-01, much less denies its authenticity or that it was adopted.[7] Findleton thus provided evidence sufficient to establish that Resolution 08-01 was authentic and adopted by the General Council.[8]

---

[7] A declaration of the Tribe's counsel, Marston, submitted with the original reply papers in support of the Tribe's earlier filed motion, stated that the reference to Resolution 08-01 in the Tribal Council Resolution was a "typographical error," that it should have been to 07-01 and that "[t]here is no 08-01 General Council Resolution." This apparently was prior to the production of that resolution at the deposition of Richard Campbell. In the declaration of Marston submitted with the renoticed motion, there is no mention of either resolution.

[8] Findleton invokes California Evidence Code section 622 and argues that facts recited in an instrument are conclusively presumed true as between parties to the instrument. Findleton has not provided a basis for the application of this state statute, and as set forth above federal law generally governs whether there was a waiver of tribal sovereign immunity. We thus agree with the Tribe's argument in its brief and at oral argument that state law does not govern here. Further, the Construction Agreement's choice-of-law provision states that absent Tribal law on the subject (which neither party claims exists), federal law applies. In any event, we need not go so far as to invoke state law or apply a conclusive presumption. We hold only that Findleton established a prima facie case that the Resolution was adopted, and that the Tribe did not rebut it.

14

**D.** *The Tribal Constitutional Mechanism for Delegating Authority to Waive Tribal Sovereign Immunity*

The primary dispute between the parties lies not in the existence or nature of the resolutions but in the meaning of the tribal constitution.[9] There is no dispute the Tribal Council could not validly waive the Tribe's sovereign immunity from suit without a delegation of authority from the General Council. The provisions of the Tribe's constitution addressing the powers of those bodies unambiguously require the Tribal Council to secure the General Council's "consent" (art. V, § 6, subd. (c)(6)) and "prior approval" (art. VII, § 1, subd. (q)) to waive the Tribe's immunity. The question is *by what means*.

Findleton asserts that the constitution allowed the General Council to delegate authority to the Tribal Council to waive the Tribe's sovereign immunity through the measures the Tribe employed here; that is, that the General Council did so for development contracts relating to the Project by adopting Resolutions 07-01 and 08-01, and the Tribal Council waived the Tribe's immunity for purposes of the agreements with Findleton both by providing arbitration clauses in those agreements and by adopting the Tribal Council Resolution expressly waiving the Tribe's immunity with respect to Findleton's proposal to amend the agreements.

The Tribe's current interpretation is based on article V, section 6, subdivision (b) of the constitution, which provides that "[t]he General Council shall exercise its powers of self-government through the initiative, referendum, repeal and recall powers as set forth in Articles XI, XII, and XIII, of this Document." The Tribe's position is that this

_____

[9] The Tribe initially provided and authenticated an undated document with a 2007 footer as its constitution. However, the constitution on which the Tribe ultimately relied in the trial court and which both parties on appeal accept as the constitution actually adopted by the Tribe is the one attached to the Declaration of Tribal Secretary Candace Lowe, enacted by the Tribe's General Council in October 1980. Findleton objected to admission of the 1980 constitution and questioned its authenticity below, but on appeal he does not challenge the trial court's admission of and reliance on that document. We will refer to that document, which bears the title of "The Document Embodying the Laws, Customs and Traditions of the Coyote Valley Band of Pomo Indians," as "the constitution."

provision required the General Council, in delegating to the Tribal Council the power to waive the Tribe's immunity, to use the initiative, referendum, repeal or recall process, and that in purporting to delegate such authority in General Council Resolutions 07-01 and 08-01 the General Council acted without constitutional authority. Therefore, according to the Tribe, the Tribal Council Resolution purporting to waive immunity as to Findleton was unauthorized as well.

The trial court agreed with the Tribe, but we review the issue de novo. In interpreting the tribal constitution, we consider its particular provisions, but do so in the context of the whole document. (*McCulloch v. Maryland* (1819) 17 U.S. 316, 406 [interpretation of constitution "depend[s] on a fair construction of the whole instrument"]; *K Mart Corp. v. Cartier, Inc.* (1988) 486 U.S. 281, 291 [in ascertaining plain meaning of statute, court must "look to the particular statutory language at issue, as well as the language and design of the statute as a whole"].)

We begin with the procedures the Tribe contends were required for a valid delegation. These appear to us to be inapplicable on their face. As said, article V, section 6, subdivision (b) states that "[t]he General Council shall exercise its powers of self-government through "the initiative, referendum, repeal and recall powers as set forth in Articles XI, XII, and XIII, of this Document." Articles XI, XII and XIII govern the procedures for Removal and Recall, Referendum and Repeal and Initiative, respectively. None provides a mechanism for the General Council to "consent" or give its "prior approval" to the Tribal Council's waiver of the Tribe's sovereign immunity.

Article XI solely concerns the procedures to remove or recall a member of the Tribal Council from office, which has no relevance to the issue of delegation. Article XII, addressing the power of referendum and recall, concerns the procedures by which members of the General Council (i.e., the members of the tribe eligible to vote and participate in its self-governance) may demand a referendum or a repeal of "any proposed or enacted tribal law or any action undertaken *by the Tribal Council*." (Italics added.) That section, too, is not a mechanism by which the General Council itself may "consent" or give "prior approval" to a Tribal Council action.

16

Article XIII, which provides the power of initiative, also does not apply. It governs the procedure by which tribal members may raise "[a]ny matter of concern to the Band not previously or previously [*sic*] considered or acted upon *by the Tribal Council* may be presented to the Tribal Council for action or to the General Council, for a vote" and requires that the petition be filed with the Secretary of the Tribal Council. (Italics added.) But a delegation of authority by the General Council to the Tribal Council to waive sovereign immunity is not something the Tribal Council would "consider[]" or "act[] upon." The procedures set forth in article XIII for conducting an initiative further confirm that the initiative power is not intended as a means for the General Council to delegate any power to the Tribal Council. Article XIII specifies that such a matter "may be presented to the Tribal Council for action or to the General Council, for a vote" by means of a petition signed by the requisite number of people (specifically, 20 percent of the members of the General Council) and filed with the Secretary of *the Tribal Council*, but it then directs that "*[t]he Tribal Council shall* consider the matter presented in the petition at its next regular or special meeting." (Italics added.) Only if the Tribal Council "fails to act upon or disapproves the matter within 30 days" is the petition submitted to the General Council. The Tribe's current interpretation would mean the Tribal Council could delegate to itself the General Council's authority to waive the tribe's immunity, which cannot be squared with the articles of the tribal constitution requiring the *General Council's* "consent" and "prior approval" before the Tribal Council may waive sovereign immunity. Finally, article XIII concludes by specifying that after the General Council votes on the matter, its majority vote "shall be conclusive and binding upon the Tribal Council." It makes no sense to specify that a delegation of authority from the General Council to the Tribal Council is binding *on the Tribal Council.*

In short, the initiative power of article XIII appears to be a means solely by which tribe members can *bypass* the *Tribal Council's* ordinary procedures for considering and acting on matters *within its purview*, and for tribe members to bring those matters to the Tribal Council's attention and require it to act on them, and, only if it fails to act in the manner proposed in the petition, to bring the matter to the General Council. We see no

17

textual basis for concluding that any of these provisions urged by the Tribe applies to waivers of the Tribe's sovereign immunity.

On the other hand, the constitution plainly contemplates that not all actions taken by the General Council will involve the initiative, referendum, repeal or recall processes, and that some actions will be taken by a vote at meetings of the General Council. That delegation of authority to waive immunity is one such action is apparent from review of a number of the constitution's provisions. Article V, section 1 states that "[a]ll *tribal members . . . shall be eligible to vote* in all tribal elections, referenda, recalls, repeals *and at all meetings of the General Council*." (Art. V, § 1 [italics added].) Section 2 of the same article goes on to describe the procedures for holding meetings of the General Council, including requiring that such meetings be "open to all tribal members," shall be held "at least four times each year," shall be preceded by notice mailed to each member and shall have a quorum present consisting of twenty percent of the total voting membership of the Tribe. (*Id.*, § 2, subd. (a).) It further states: "Each voting member of the General Council has one vote on all matters, and *all matters to be acted on at a General Council meeting* shall be approved or disapproved by a majority vote of those present and voting unless otherwise specified in this Document." (*Id.*, § 2, subd. (a)(4) [italics added].) It goes on to provide that an elected tribal "President" or "Chief" shall "preside over the meetings of the General Council," "vote on all issues before the General Council," "call special meetings of the General Council"[10] and "prepare and cause to be published at least five days before the meeting, an agenda for each General Council meeting." (*Id.*, § 4, subds. (a), (b), (d).) There would be no point in holding quarterly General Council meetings, with a required forum, and submit issues to a vote at such meetings if the General Council could act only by means of the powers of initiative, referendum and repeal, removal and recall.

Moreover article IV, section 3, like the article (art. V, § 6, subd. (b)) on which the Tribe relies, specifies that the General Council shall exercise "all powers of self-

---

**10** The constitution also allows the Tribal Council or ten members of the General Council to call for a special meeting. (Art. V, § 5.)

18

government" by initiative, referendum, recall or repeal. Immediately preceding article V, section 6, subdivision (b) the constitution states that "[a]ll powers of the Band shall be vested in the General Council, including those powers delegated to the Tribal Council and any other such powers as may in the future be granted or delegated to the Band by federal law." (*Id.*, § 6, subd. (a).) This suggests that the phrase "powers of self-government" means something narrower than all the powers of the Tribe. The constitution does not provide a definition for either the Tribe's general powers or its "powers of self-government."

The constitution goes on to provide that certain "powers shall be exclusively reserved to the General Council" and that no exercise of such powers "by the Tribal Council or by any other agency or officer of the Band shall be effective unless the General Council has given *its consent* to such action in accordance with Article VII of this Document." (Italics added.) Included, among other powers, is "[t]he power to waive the Band's immunity from suit." (Art. V, § 6, subd. (c).)

Article VII, in turn, enumerates the powers of the Tribal Council. Among other things, those powers include managing tribal business affairs, administering tribal funds, levying taxes, managing tribal lands, establishing corporations and businesses, and, as most relevant here, promoting economic development by, among other things, "engag[ing] in business activities and projects" that "promote the economic well-being of the Band and its members." The Tribal Council's powers also include enacting laws, statutes and codes, and establishing tribal courts. And, as noted, the Tribal Council is authorized to defend lawsuits against the Tribe and in the course of doing so to assert the defense of sovereign immunity "except that no waiver of sovereign immunity can be made by the Tribal Council without *prior approval* of the General Council." (Italics added.)

A number of powers conferred by the constitution on the Tribal Council require some approval by the General Council. Some, such as defending lawsuits and waiving sovereign immunity, or condemnation of assignments of tribal land by the Tribal Council, require "approval of the General Council." (Art. VII, § 1, subds. (*l*), (q).) Others require

19

approval by a supermajority vote and/or vote with a specified quorum by the General Council. (See *id.*, § 3 [transfer of tribal land out of tribal ownership must be "approved by" vote of 2/3 of General Council with quorum of 100 persons entitled to vote]; *id.*, § 4 [encumbrance of tribal land must be "approved by" vote of majority of General Council with quorum of 50 persons entitled to vote]; *id.*, § 5 [development of natural resources of tribe for commercial or industrial purposes requires "consent" of majority vote of General Council with quorum of 50 persons entitled to vote].) Laws passed by the Tribal Council must "be presented to the (President) of the General Council for his or her approval within five (5) days following the date of . . . passage by the Tribal Council," and laws passed by the Tribal Council on an override of a presidential veto must be "presented to the General Council, at a duly convened special meeting, for approval within fifteen (15) days following the date that the Tribal Council overrides the veto of the (President)" and become effective "[i]f the General Council approves the enactment by a majority vote, providing a quorum is present." (Art. VIII, §§ 1, 2.)

The constitution thus uses the terms "consent" and "approve" (specifically, "approved" and "approval") to refer to votes by the General Council. In at least two instances, it uses the phrase "approval of the General Council" without specifying the mechanism for such approval. Where the constitution does spell out that the mechanism is a vote of the General Council, it does so with the specification that a supermajority vote is required and/or that a higher than 20-percent quorum is required, or, finally, that the vote must take place within a certain window of time. The terms "consent" and "approve" in clauses that do not specify the method for providing consent or approval logically must be understood as meaning a vote of the General Council without any supermajority vote or higher-than-usual quorum requirement.

In short, when read as a whole, the constitution supports the interpretation advanced by Findleton: that the "consent" the General Council must give for the Tribal Council to exercise the power to waive the Tribe's immunity under article V, section 6, subdivision (c)(6), and the counterpart reference to the "prior approval of the General Council" required for the Tribal Council to waive the Tribe's immunity under article VII,

20

section 1, subdivision (q), can be obtained by a majority vote of the General Council—which the Tribe concedes occurred when it adopted Resolution 07-01, and the undisputed evidence demonstrates also occurred with respect to Resolution 08-01.

The Tribe's position that these terms require an *initiative* is not a reasonable interpretation, even based upon the text of the constitution alone. But there is more. Strong indicia of the meaning of the relevant provisions may also be found in the Tribe's pre-litigation words and deeds. The General Council voted twice, to approve resolutions expressly exercising that body's authority under article V, section 6, subdivision (c)(6) [requiring General Council consent for Tribal Council to exercise power to waive sovereign immunity] and article VII, section 1, subdivisions (q) and (w) [delegating to Tribal Council power to defend Tribe against lawsuits while requiring General Council's approval to waive immunity, and to "take all actions" necessary for exercise of constitutionally delegated powers] "to delegate to the Tribal Council its authority to waive the Tribe's immunity from suit." The Tribal Council unanimously approved, and Chairman John Feliz, Jr. and Secretary Candace Lowe signed, the Tribal Council Resolution stating that "by passage of General Council Resolution 08-01, the General Council authorized the Tribal Council to waive the Tribe's Sovereign Immunity on a limited basis" for purposes of contracts related to the new gaming facility and, pursuant to that authority, expressly consented to such a waiver as requested by Findleton. The Tribe's and its officials' pre-litigation conduct speaks louder than their post-litigation words when it comes to the proper interpretation of the tribal constitution. Together, the constitution read as a whole, coupled with the Tribe's repeated interpretations of it as allowing the General Council to delegate its waiver authority by majority vote, are compelling.

The Tribe argues nonetheless that we must defer to its interpretation of its own constitution. But the question this argument begs is *which* of its interpretations we should defer to: the interpretation its legislative bodies acted in accordance with before the dispute with Findleton arose, or the opposite interpretation its attorney and officials advanced as the Tribe's litigation position after the dispute arose?

21

The Tribe cites decisions of the Interior Board of Indian Appeals (IBIA) and federal courts addressing intratribal disputes and the relationship between the federal and tribal governments and expressing a policy of deferring to tribal interpretations of tribal law. We need not determine whether cases involving relations between tribes and between a tribe and the federal government are analogous to this one, as the Tribe contends. That is because there are cases that, like this one, address disputes between Indian tribes and third parties that apply principles similar to those applied in the IBIA cases cited by the Tribe. The latter cases, like the IBIA cases, are based on Congress's commitment to a "policy of supporting tribal self-government and self-determination." (See *National Farmers Union Ins. Cos. v. Crow Tribe of Indians* (1984) 471 U.S. 845, 856.) "Consistent with this policy," the cases hold that " 'tribal courts are best qualified to interpret and apply tribal law.' " (*Prescott v. Little Six, Inc.* (8th Cir. 2004) 387 F.3d 753, 756.) Thus, where a tribal court has interpreted a tribal constitution or statute, the federal courts accord significant deference to such interpretations, and so should we. (See *id*. at pp. 757–758; *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe* (8th Cir. 2010) 609 F.3d 927, 943 [federal courts do not conduct de novo review over tribal court rulings under tribal law].) For the same reasons, federal courts generally recognize and enforce tribal judgments (*Wilson v. Marchington* (9th Cir. 1997) 127 F.3d 805, 810) and refrain from interfering with ongoing tribal court proceedings to determine tribal court jurisdiction. (*National Farmers*, at p. 857.) Moreover, federal courts do not "readjudicate questions—whether of federal, state or tribal law—already resolved in tribal court absent a finding that the tribal court lacked jurisdiction or that its judgment be denied on comity for some other valid reason." (*AT&T Corp. v. Coeur d'Alene Tribe* (9th Cir. 2002) 295 F.3d 899, 904.)

Here, however, the Tribe does not ask us to defer to a tribal court interpretation of its constitution. Rather, it asks us to defer to its current interpretation of its constitution, which conflicts with prior interpretations of its own governing bodies. None of the cases cited by the tribe—and none we are aware of—stands for the proposition that a tribe's *litigation position* regarding the meaning of tribal law must necessarily be respected

22

regardless of whether it is reasonable or consistent with prior official interpretations by the tribe.[11] The cases cited by the Tribe and those discussed above advance the principle of respect for Indian sovereignty and self-government by deferring to the interpretation of a tribal law adopted by the tribe's own governing bodies, such as a tribal court or tribal legislature. Here, two of the Tribe's governing bodies—the General Council twice, and the Tribal Council once—adopted resolutions interpreting the constitution to permit the General Council to delegate the authority to the Tribal Council to waive sovereign immunity by resolution. It is those governing bodies of the Tribe whose interpretations are entitled to deference, at least in the absence of any contradictory tribal court interpretation. For these reasons, we defer to the interpretation of the constitution adopted by its General Council and Tribal Council, and not to the Tribe's current position in its briefing, which is not an "interpretation" as contemplated by these authorities but a position undertaken in litigation. Thus, we conclude that the General Council validly delegated its authority to waive tribal sovereign immunity to the Tribal Council when it adopted Resolutions 07-01 and 08-01.

---

[11] One example of the cases the Tribe cites is *Shakopee Mdewakanton Sioux Community v. Acting Minneapolis Area Director* (1995) 27 IBIA 163. In holding the Secretary of the Interior was required to defer to the tribe's "reasonable interpretation of its own Constitution and laws," the IBIA was addressing an interpretation *reflected by an ordinance enacted by the tribe*. The question was whether the tribe's ordinance was consistent with its constitution. Because the court concluded the interpretation reflected by the tribe's ordinance was reasonable, it deferred to the that interpretation. (*Id.* at pp. 168–169, 171–172.) Another example is *Brady v. Acting Phoenix Area Director* (1997) 30 IBIA 294, in which the IBIA held it was error for the BIA to interpret the tribe's constitution without considering whether the tribe "had arrived at an interpretation of its own" because there were allegations indicating the Tribal Council had previously acted as a forum for similar disputes and may have interpreted the tribal law in question. (See *id.* at p. 299.) In these cases, the deference was owed not merely to an interpretation advanced as the litigation position of the tribe, but to an interpretation adopted by the tribe's own governing body either in the form of an legislative enactment or quasi-judicial proceeding prior to the litigation.

**E.** *The Tribal Council's Actions and Waiver of Sovereign Immunity*

The question remains whether, once the General Council delegated the authority to the Tribal Council to waive sovereign immunity, the Tribal Council did so either through entering contracts with Findleton containing arbitration clauses or by enacting the Tribal Council Resolution.

We have some doubt about the former, although the issue is by no means simple. The agreements contain arbitration clauses, to be sure, and there is ample authority that such clauses, if executed on behalf of a tribe by a person or body authorized by the tribe to do so, may have the effect of waiving the tribe's sovereign immunity. (See, e.g., *C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, *supra*, 532 U.S. 411; *Smith v. Hopland Band of Pomo Indians* (2002) 95 Cal.App.4th 1.) These authorities were in existence well before the Tribe executed the agreements with Findleton that included the arbitration clauses. On the other hand, a waiver must be clear (*C&L*, at p. 418), and at least one California court has declined to find a waiver of immunity from suit in state or federal court for purposes of enforcing an arbitration clause or award where the intent to allow suit for such purposes was unclear. (*California Parking*, *supra*, 197 Cal.App.4th at pp. 818–819 [agreement's explicit exclusion of rule 48(c) of American Arbitration Association rules, granting consent to allow federal or state court to enter judgment on award, precluded finding of waiver of sovereign immunity].)

Here, the arbitration clauses were clear enough, providing for arbitration "in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect," without exception. They provided that the "agreement to arbitrate . . . shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof" and "[t]he award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." Complicating the task of interpretation is not the arbitration clauses but rather the provisions immediately following those clauses, which state "[n]o term or provision in this Agreement shall be

24

construed as a waiver of the sovereign immunity of the [Tribe]" and "[t]he Parties specifically agree that the sovereign immunity of [the Tribe] shall not be waived for disputes or other matters related to this Agreement." These disclaimers render the meaning of the agreements in regard to waiving sovereign immunity ambiguous.

On the one hand, the United States Supreme Court has indicated that in an appropriate case it would "apply 'the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it.' " (*C&L*, *supra*, 532 U.S. at p. 423.) On the other hand, the court has held that a waiver must be "clear" and did not apply the above-mentioned rule of construction in *C&L* because it found the contract unambiguous. (*Ibid.*) Here, it is difficult to reconcile the arbitration clauses of the Construction and Rental agreements with the clauses in these same agreements that disclaim a waiver of immunity. This is especially so given the language in the arbitration clauses authorizing *judicial* enforcement.[12] Indeed, not even the Tribe has suggested any way to harmonize the conflicting clauses.[13] But there is also tension between the Supreme Court's rule that "a tribe's waiver must be 'clear' " and its statement in *C&L* that ambiguous language should be construed against the party who drafted the contract, at least in cases such as *C&L* and this case where the drafting party was the tribe. (See *C&L*, *supra*, 532 U.S. at p. 423.)

In light of the complexity the arbitration clause issue presents, we will turn first to the question whether the Tribe waived immunity by adopting the Tribal Council Resolution. If it did, the question whether it previously waived immunity by entering into the Construction and Rental agreements is immaterial. The question regarding the Tribal Council Resolution is simply whether it constitutes an express and clear waiver.

---

[12] It was unclear from the record, but we were informed at oral argument that the Tribe had no functioning tribal court at the time these agreements were executed.

[13] Federal common law governing contract interpretation includes the "cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other." (*Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 63.)

25

Findleton asserts that the Tribal Council waived the Tribe's immunity by adopting the Tribal Council Resolution and that the surrounding circumstances support that determination. We agree.

In the proposal presented by Findleton to tribal officials, including members of the Tribal Council, Findleton offered to complete work on certain infrastructure improvements that were included in the scope of the contract already ("currently under contract") for which there were outstanding balances totaling about $231,000, to perform additional work that the Tribe had "previously approved" but that were "not currently under contract" for which the cost would be about $296,000, and to defer payment until 2009. In exchange, he sought four commitments from the Tribe: that it would (a) amend the contract to include the new scopes of work, (b) agree to pay interest "to help offset the costs of carrying the outstanding balance," (c) make payment in 2009 on an installment schedule; and (d) issue a Tribal resolution accepting these terms and conditions and including a limited waiver of sovereign immunity.

The day after Findleton conveyed this proposal to the Tribe, the Tribal Council convened a meeting at which it approved the Tribal Council Resolution. That resolution, among other things, acknowledged that Findleton had made the August 19, 2008 proposal, that he had "requested a limited waiver of Sovereign Immunity from the Tribe in connection with this proposal," and that "by passage of General Council Resolution 08-01, the General Council [had authorized it] to waive the Tribe's Sovereign Immunity on a limited basis in contracts related to the development and financing of a new gaming and resort facility and related infrastructure and utilities to support the new gaming facility and the Tribal community." The Tribal Council Resolution stated that the Tribal Council accepted the terms and conditions outlined in Findleton's August 19, 2008 proposal, approved the third amendment to the agreement and "consent[ed] to a limited waiver of Sovereign Immunity of the Tribe, which is limited to 1.) provide for arbitration of disputes; 2.) avoid dispute resolution in state courts; 3.) limit recourse solely to casino assets; and 4.) shall not allow recourse to assets owned by individual members of the Tribe."

26

These acts effected an express waiver of the Tribe's immunity that was clear and unequivocal, and limited to Findleton's agreements with the Tribe, as amended by the proposal and the Third Amendment. Whatever ambiguity the disclaimer clauses created was eliminated by the Tribal Council's acceptance of Findleton's proposal and its adoption of the resolution expressly waiving sovereign immunity. The waiver was limited to arbitration of disputes regarding those agreements and to recourse against certain assets of the Tribe. The waiver extended to judicial enforcement of the right to arbitrate and of any arbitration award, as indicated by the arbitration provisions of the agreements, the language in Findleton's proposal and the Tribe's express acceptance of that proposal.

In view of our holding that the Tribe waived its sovereign immunity to this extent, we need not reach Findleton's arguments that the General Council's adoption of Resolutions 07-01 and 08-01, tribal officials' statements to him, and the Tribal Council's adoption of the Tribal Council Resolution estop the Tribe from claiming it did not waive its immunity.

## DISPOSITION

The Superior Court, after holding that the Tribe had not waived its sovereign immunity, declined to reach the Tribe's second defense asserting that Findleton's claims are barred by his failure to exhaust tribal administrative remedies. Neither party has briefed that issue or asked us to resolve it in the first instance on appeal. Nor have the parties briefed the question whether the exhaustion issue is within the scope of their agreement to arbitrate and therefore to be decided by the arbitrators. We therefore do not address these issues. The superior court's order granting the Tribe's motion to quash service of summons and dismissing the case is reversed. We remand the case to the superior court for further proceedings consistent with this opinion. Appellant shall be entitled to costs on appeal.

27

STEWART, J.

We concur.

KLINE, P.J.

RICHMAN, J.

*Findleton v. Coyote Valley Band of Pomo Indians*  (A142560)

Trial Court:   Mendocino County Superior Court

Trial Judge:   Hon. Jeanine Nadel

Counsel:

Timothy W. Pemberton, for Plaintiff and Appellant.

Rapport and Marston, Lester J. Marston, for Defendant and Respondent.